IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

AUGUST 1998 SESSION



**FILED**

**September 23, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. No. 01C01-9707-CC-00289 |
| APPELLEE, | ) | |
| | ) | Lincoln County |
| v. | ) | |
| | ) | Honorable Charles Lee, Judge |
| JOHN R. LEWIS, | ) | |
| | ) | (Aggravated Sexual Battery) |
| APPELLANT. | ) | |

FOR THE APPELLANT:

Randall E. Self
P. O. Box 501
Fayetteville, TN 37334

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter
425 Fifth Avenue, North
Nashville, TN 37243-0493

Karen M. Yacuzzo
Assistant Attorney General
425 Fifth Avenue, North
Nashville, TN 37243-0493

William M. McCown
District Attorney General
215 East College
Fayetteville, TN 37334

Weakley E. Barnard
Assistant District Attorney General
Marshall County Courthouse, Room 407
Lewisburg, TN 37091

OPINION FILED: _____

AFFIRMED

L. T. LAFFERTY, SPECIAL JUDGE

## OPINION

The defendant, John R. Lewis, was convicted of aggravated sexual battery by a Lincoln County jury. The trial court imposed a sentence of ten (10) years in the Department of Correction.

In this appeal of right, the defendant presents the following issues:

(1) The court erred in allowing statements of V.B.[1] made to medical personnel to be admitted into evidence under Rule 803 (4) of the Tennessee Rules of Evidence.

(2) The statements and confessions made by the defendant to Detective Doug Borenger were made in violation of the defendant's privilege against self-incrimination.

(3) The State violated Tennessee Rules of Evidence 608 by asking the defendant whether other minor girls were prohibited from coming to his home.

(4) The court erred in sentencing the defendant by enhancing his sentence for abusing a position of private trust and by not applying as a mitigating factor that the defendant's criminal conduct neither caused nor threatened serious bodily injury and by not considering the defendant's positive contributions to his family and to society or affording any weight to the absence of any substantial or relevant criminal history.

We affirm the judgment of the trial court.

## HISTORICAL FACTS

On the evening of November 1, 1996, the victim, V.B., age 9, was a guest in the defendant's home. The victim and her brother, J.B., age 12, were spending the night with the defendant's two children, L. L., age 8, and B.L., age 12. The victim and the defendant's daughter, L. L., went to bed at 8:00 p.m. The victim testified she wore her dad's t-shirt which came just below her knees and had on panties. The victim and L. L. slept in a double bed, with L.L. facing the wall and the victim facing the outside edge.

---

[1] In order to protect the identity of minor victims of sexual abuse, it is the policy of this Court to refer to the victims by their initials. *See State v. Schimpf*, 782 S.W.2d 186, 188, n.1 (Tenn. Crim. App. 1989).

The victim testified that in the early morning hours of November 2, 1996, she was awakened by the defendant, who was kneeling by the bed. The defendant was rubbing the victim's t-shirt in the area of her breasts. Then, the defendant reached under the victim's t-shirt and began rubbing her breasts in a circular motion. The defendant then moved his hand down her stomach to her private part and began rubbing the outside of her panties. The victim testified the defendant then reached inside her panties and "tried to go inside of me . . . He kind of went up and down, like that." The victim testified the defendant kissed her on the mouth with his tongue. The victim was pretending to be asleep during this episode.

The victim then rolled over in bed facing L.L. and the wall. The defendant had left the bedroom. The victim got up and went to the bathroom, locked herself in, and began to cry. The victim was scared. After five minutes, the victim came out of the bedroom and saw the defendant sitting in the living room. The defendant asked the victim, "Are you okay?", to which the victim did not respond. The victim returned to bed and fell asleep. Later, when the victim had awakened, the victim asked the defendant if she could call her mother. The defendant advised her it was too early. Later that day, the victim's mother arrived and picked up both her and her brother. They proceeded to Krystal's. While in the car, the victim told her mother what had occurred at the defendant's home.

Mrs. Sherry Armstrong, mother of V.B., testified she and her ex-husband had two children, V. B., age 9, and J.B., age 12. The parents had joint custody and, on the weekend of November 2, 1996, Mrs. Armstrong had custody. On the night of November 1, 1996, Mrs. Armstrong learned she was to pick up her children at 8:00 a.m. on November 2, 1996 at the defendant's home. Mrs. Armstrong did not know the defendant nor his family. Mrs. Armstrong arrived at the defendant's home at 8:00 a.m., but was told by her son, J.B., that he wanted to stay and see the Tennessee football game and his sister was asleep.

At 1:00 p.m., Mrs. Armstrong picked up her children and proceeded to Krystal's for

lunch. After approximately 15 minutes, Mrs. Armstrong observed her daughter crying. The victim, V.B., told her mother what had happened at the defendant's home. Mrs. Armstrong proceeded to the Fayetteville Police Department and filed a complaint with Officer Karen Gardner. Ms. Joan Quick, a Department of Human Services (DHS) employee, arrived and obtained the facts from the victim. Afterwards, Mrs. Armstrong took her daughter to the Lincoln County Regional Hospital for an examination.

The State called Ms. Judy Wiser, emergency room nurse, to testify as to her findings. Ms. Wiser, a licensed practical nurse and employee of the Lincoln Regional Hospital since 1989, testified she obtained a history from the victim at 5:30 p.m. on November 2, 1996 for the doctor's treatment. Ms. Wiser testified she gave this history to Dr. Patel, and assisted Dr. Patel in his examination of the victim. When asked to relate the victim's history, Ms. Wiser testified:

> The child stated to me that on the night of 11/1/96, that she spent the night with a friend. And early in the morning of 11/2/96, that the friend's father came into the room where she and the friend were asleep, and the father began to touch her on both breasts, and then he moved his hand down her stomach, went to her vagina and started rubbing her vagina, and then proceeded to stick his finger in her vagina, then kissed her by putting his tongue on her mouth, and that was stated exactly by the child.

During the examination of the victim, Ms. Wiser observed some redness at the entrance of the victim's vagina, which could be consistent with the child's story. Also, the victim complained of burning upon urination. Ms. Wiser testified she observed no tears, scratches, or bruises at the vaginal entrance, and the redness observed could be caused by many things. The victim was given no medication or any treatment procedures.

Dr. Yashwant Patel testified he is a licenced physician and has practiced in Lincoln County for 20 years. Dr. Patel has experience in the examination of children in abuse cases. Dr. Patel advised the jury he reviewed the history of the victim, V.B., and, along with Nurse Wiser, examined the victim at 5:30 p.m. on November 2, 1996. Dr. Patel found slight irritation in the victim's vaginal area, which meant redness in the vaginal area on the left side, but no tears. Dr. Patel found no evidence of penetration. The doctor further

4

testified he found no reason for any medication, but told the victim to follow up treatment, if needed.

The State next called Detective Doug Borenger of the Lincoln County Sheriff's Department to testify as to the results of his investigation. As the Criminal Investigator for the Sheriff's Department, Detective Borenger reviewed the victim's complaint and the DHS report. The officer contacted the defendant. The detective and the defendant agreed to meet on November 8, 1996 at 8:30 a.m; however, the defendant failed to appear. Detective Borenger called the defendant at his home. The defendant sounded intoxicated and said he had been drinking. The detective and the defendant rescheduled their appointment for November 12, 1996.

On November 12, 1996, Detective Borenger and Special Agent Donna Pence, Tennessee Bureau of Investigation, interviewed the defendant. Agent Pence advised the defendant of his rights and the defendant acknowledged this by signing a form. The defendant denied the incident, stating he had a bad memory, was prone to blackouts, and had a drinking problem. The defendant had been advised he was not under arrest and, at the conclusion of the interview, the defendant was permitted to leave.

Detective Borenger next interviewed the defendant on November 25, 1996 at 3:45 p.m. The defendant had arrived at 1:00 p.m. for an interview by Special Agent Michael Smith, Tennessee Bureau of Investigation. Agent Mike Smith advised the defendant of his rights, which he acknowledged by signing a form. At 3:45 p.m., both Detective Borenger and Agent Smith started an interview with the defendant. Concerning the allegation, the defendant stated he had gone into the bedroom in the early morning hours of November 2 and had touched the victim's hair and run his hand down her shoulder, down over her stomach, and had touched her, in his words, "where the hair grows."

Later, the defendant requested to speak to Detective Borenger privately. Both parties went to a restroom/locker room, used by deputy sheriffs, where the defendant

5

advised the detective he was 47 years old and did not know what a vagina was. After an explanation of a female's genital area by Detective Borenger, the defendant slapped his thigh and said "You mean a p----." Whereupon, the defendant agreed to talk to Detective Borenger further. After a re-reading of the rights to the defendant, the defendant gave a short, written statement. The statement was read to the jury.

Detective Borenger agreed at the interview in November, 1996, he and the defendant had a general discussion about loss of memory, blackouts, and drinking problems. Detective Borenger also agreed he might have suggested the defendant receive alcohol abuse treatment, since he had made similar suggestions in his police experience.

The defendant testified in his own behalf. The defendant related he is a high school graduate, an Army veteran of thirteen and one-half years, and was presently employed as an over-the-road truck driver. The defendant is married and has two children.

The defendant testified he observed the victim and her brother dropped off at his home, by the children's father, on the evening of November 2, 1996. The defendant had been drinking and went to bed between 6:00 and 7:00 p.m. The defendant woke up between 11:30 p.m. and 12:00 a.m. and went to check on the children, as it was chilly. The defendant then went in the kitchen and began drinking some beer. The defendant testified he saw his daughter and the victim in the living room at about 12:00 a.m., and they were cleaning house. He told them he would give them $1.00, and both girls went back to bed.

The defendant testified, at about 4:00-4:30 a.m., he went into the girls' bedroom and noticed they had no covers over them. The defendant covered them up, while both were asleep. The defendant testified that V.B. had hair in her eyes, so he reached down and pushed it away. Further, he stated while he was pulling the covers up, "my hand might have went down her arms or her deals or whatever." The defendant returned to the kitchen and turned the TV on. The defendant testified he saw the victim go to the bathroom and she was crying. Upon the defendant's inquiry, the victim stated her stomach hurt. The

6

victim asked to call her real mother, but the defendant refused her, stating it was too early. Although the victim told the defendant her mother was up that early, the defendant advised the victim to wait until 7:00. The victim returned to bed. The defendant went to bed at 5:00 and got up between 11:00 a.m. and 12:00 p.m.

The defendant testified he recalled everything that night and completely denied he rubbed or touched the child in a sexual manner, nor for any gratification.

The defendant testified he had several conversations with Detective Doug Borenger. The defendant testified he met Detective Borenger and Agent Pence on November 12, 1996. Although he does not recall signing a waiver of rights form, he acknowledged his signature on the form. During this interview, the defendant recalled they discussed his abuse of alcohol and that he could probably get treatment for it, if put on probation. In this interview, the defendant informed the officers about touching V.B.'s hair and covering her arm, but denied telling the officers he touched her breasts. The defendant told Agent Pence, "I didn't go into my daughter's bedroom. I remember walking down the hall and looking in. I just kind of poked my head in. I did not go in." When asked about this inconsistent statement with his testimony of being in the bedroom, the defendant gave a confusing reply, "Not knowingly, at the time."

On November 25, 1996, the defendant agreed to appear at the Lincoln County Sheriff's office for the purpose of a polygraph test to be administered by the Tennessee Bureau of Investigation. At 1:00 p.m., the defendant was interviewed alone by Special Agent Michael Smith. The defendant acknowledged Agent Smith read to him an advice of rights, which included the statement the defendant was not under arrest and at any time he was entitled to cease the interview and free to leave. The defendant signed the form and submitted to this test.[2] The defendant was reinterviewed by Detective Borenger and Agent Smith at 3:45 p.m.

_____

[2]The defendant, in the opinion of Agent Smith, was deceptive. The test concluded at 3:30 p.m.

During this interview, the defendant testified he became scared of Agent Smith, who had slammed the table with his hand. Also, in this interview the defendant testified he was denied a Coke, but was allowed to use an adjoining bathroom. After leaving the bathroom, the defendant entered the lobby of the Sheriff's office, spoke to his wife, and smoked a cigarette. The defendant informed his wife, "I ain't got long, but things don't looked [sic] good, and you need to get out here and get a lawyer." However, upon returning to the interview room, the defendant did not request a lawyer. Upon the defendant's return, he admitted signing a statement, stating he had felt of the victim from the outside, felt her vaginal area, and went down to the area "where the hair grows." The defendant testified he gave this statement because he was scared.

The defendant corroborated the testimony of Detective Borenger as to what occurred in the restroom and signed a statement. The defendant believed he could not leave until he signed that statement. Based upon all of this testimony, the jury found the defendant guilty as charged.

## APPELLATE ISSUES

### A.

### TENNESSEE RULE OF EVIDENCE 803(4)

The defendant contends the trial court erred in permitting Ms. Judy Wiser, nurse practitioner, to testify in the presence of the jury as to the statements made by the victim concerning the facts of the offense. Further, the defendant contends there was no basis sufficient to support the admission of the victim's statements to medical personnel under Rule 803(4), since the statements were made for evaluative purposes only and not for the purpose of medical diagnosis and treatment. *State v. McLeod,* 937 S.W.2d 867 (Tenn. 1996).

In an out of jury hearing, the State requested the trial court to permit both the mother, Sherry Armstrong, and Ms. Judy Wiser to testify as to the underlying facts related

to them by the victim, V.B. The State contended the statements made to the mother were admissible under Rule 803(2), Excited Utterance. However, the trial court denied the State's request.

Ms. Judy Wiser testified that she talked to the victim, V.B., on November 2, 1996, in the emergency room of the Lincoln Regional Hospital. Ms. Wiser testified the purpose of the history was "to help the doctor do his findings and, also, if there's any legalities involved." Ms. Wiser testified she took word for word what the victim said, including the victim did not complain of any pain at the time of the penetration, but did complain of burning upon urination. All of this information was given to Dr. Patel for his examination. Ms. Wiser testified she assisted Dr. Patel in his examination and observed some redness in the vaginal area. Ms. Wiser agreed with the State's question that the history taken in this cause was like any other history on any other examination for the purpose of making sure that the treatment was accurate and correct. Also, Ms. Wiser testified her nurse's notes reflected "Needs to be checked," which was for the purpose of an evaluation as opposed to diagnosis and treatment.

In its ruling, the trial court found the testimony of the victim's mother significant. Even if the DHS had not requested a medical examination, the mother believed an examination was necessary, stating "I was going to take her anyway," due to the child's complaint of irritation in the vaginal area. Further, the trial court found the history taken by Ms. Wiser was for the doctor's diagnosis and treatment. The trial court held:

> It gives the doctor, in my mind, when they have the complete picture of what had occurred, he has better idea of the length of time that was involved, the nature of penetration if there was some action by the alleged victim that ceased it, whether or not that could contribute to any injuries that she might have sustained.
>
> So the Court finds that there was a dual purpose in this the examination, one of which was a medical purpose, and that it is -- that the statement was taken for the purpose of diagnosis and treatment as well as the collection of evidence. But even so, it is admissible.

Trial courts have broad discretion in determining the admissibility of evidence, and

9

their rulings will not be reversed absent an abuse of discretion. *State v. Campbell,* 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995); *State v. Baker,* 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989), per. app. denied (Tenn. 1990). Rule 803(4) of the Tennessee Rules of Evidence is an exception to the rule against the admission of hearsay. It permits the admission of:

> Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

In *State v. Gordon,* 952 S.W.2d 817, 822 (Tenn. 1997) and *State v. Stinnett,* 958 S.W.2d 329, 331 (Tenn. 1997), the Rule 803(4) exception is predicated on the perception that statements made for the purpose of medical diagnosis and treatment are reliable and trustworthy:

> The rationale underlying the hearsay exception for statements made for purposes of medical diagnosis and treatment is that the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness. This motivation is considered stronger than the motivation to lie or shade the truth. Patients generally go to doctors to receive treatment, and treatment usually depends, in part, on what is said; thus the declarant has a self-interested motive to tell the truth.

*State v. Gordon,* 952 S.W.2d at 822 (quoting *State v. Barone,* 852 S.W.2d 216, 220 (Tenn. 1993)).

In *State v. McLeod,* 937 S.W.2d 867, 871 (Tenn. 1996), the supreme court addressed the rationale above in cases involving children. The supreme court said:

> Courts should not presume that statements made by a child to a medical services provider are untrustworthy, merely because there is disputable evidence of the child's motivation to be truthful. *Rather, the admissibility decision should be based upon a thorough examination of all of the circumstances surrounding the statement.* (emphasis added).

We find the circumstances surrounding V.B.'s statements are significant. Within fifteen minutes of the victim seeing her mother, the victim told her mother what happened to her at the defendant's home. The victim was taken to the Fayetteville Police Department

10

where she gave a statement to officers and a representative of the DHS. All statements were consistent in what the victim had said happened to her. Between 5:30 and 6:00 p.m., approximately thirteen hours after the offense, the victim gave a history of the facts to an emergency room nurse which was utilized by Dr. Patel in his examination for both diagnosis and treatment of any possible injuries for this offense. The examining physician found redness in the vaginal area which was consistent with the victim's history.

It is also significant that the defendant testified he did go into the bedroom and touch the victim, but denied there was any improper touching. In addressing the trial court's denial of a motion to suppress, this Court can consider testimony given at trial. *State v. Johnny M. Henning,* ___ S.W.2d ___, No. 02S01-9707-CC-00065, slip op. at 14 (Tenn., Jackson, June 22, 1998); *State v. Adrian Wilkerson and Steven Murphy,* Davidson County No. 01C01-9610-CR-00419 (Tenn. Crim. App., Nashville, August 26, 1998).

In conclusion, after consideration of the circumstances surrounding the making of V.B.'s statements, we find the statements were made for medical diagnosis and treatment. *State v. McLeod,* 937 S.W.2d 867, 871 (Tenn. 1996). We affirm the trial court's denial of the defendant's motion to suppress the testimony of the nurse practitioner as to the victim's history of this offense.

11

**B.**

**MOTION TO SUPPRESS DEFENDANT'S CONFESSION**

The defendant complains the trial court erred in not granting his motion to suppress his confession given to the Lincoln County Sheriff's Department. The defendant concedes that his *Miranda* rights were read to him, but his statement was not freely and voluntarily given, due to the coercive actions of law enforcement officers.

**(1)**

In his testimony, the defendant advised the trial court he talked to Detective Doug Borenger by phone and arranged an interview for November 8, 1996, but failed to appear due to intoxication. On November 12, 1996, the defendant testified he met with Detective Borenger and Special Agent Donna Pence of the Tennessee Bureau of Investigation at the Lincoln County Sheriff's Department. The defendant was advised of his *Miranda* rights by Agent Pence and signed a form acknowledging the same. The defendant discussed the accusation of the victim, but could not remember anything about the situation. The defendant agreed to take a polygraph test which was set up for November 25, 1996. The defendant was permitted to leave.

The defendant testified he and his wife arrived at the Lincoln County Sheriff's Department on November 25, 1996 at approximately 12:45 p.m. The defendant was taken to a conference room where he met Special Agent Michael Smith of the Tennessee Bureau of Investigation. Agent Smith administered the polygraph test. Agent Smith explained to the defendant how the test would be conducted and read a TBI advice of rights form to the defendant, which the defendant signed. The defendant testified the polygraph test took approximately one and one-half hours, during which he had several breaks and talked to his wife. At the conclusion of the test, the defendant testified he was ready to go, but Agent Smith said most people wanted to know the results. The defendant testified he was going to leave and call back about the results, but "they wouldn't let me leave--it seemed

12

everything turned completely around, he turned into a mad man, as far as I'm concerned." The defendant testified Agent Smith became irritated over two questions and the defendant's response at the end of the test. Although the defendant was of the impression he could not leave the interrogation, the defendant did talk to his wife during the break.

Upon returning to the conference room, the defendant was questioned by Agent Smith about the defendant's answers on the test. The defendant did not recall if Detective Borenger was present. In response to a question, the defendant testified that Agent Smith stated, "Don't insult my intelligence" and slammed the table with his fist. The defendant believed the agent was about to hit him. The defendant testified he wanted to talk to his wife and get a Coke, but Agent Smith told him to give the money to an officer and she would get one for him. The defendant was allowed to use the bathroom and, during this break, he "snuck" out to talk to his wife. Upon the defendant's return, Agent Smith and Detective Borenger questioned the defendant, and the defendant admitted touching the victim's hair. Agent Smith then said, "take my hand and shake it."

The defendant testified he asked to see Detective Borenger in the bathroom as the defendant was embarrassed over not knowing the term vagina. The defendant described Detective Borenger's reply as being "by the legs." The defendant acknowledged Detective Borenger wrote something down in the bathroom and he signed it. The defendant testified that, as he and his wife were leaving the parking lot, Detective Borenger came to the car and advised the defendant he had forgotten to have the defendant sign the waiver form for the advice of rights. Also, the defendant testified he did not request an attorney nor was he under arrest.

Mrs. Rhonda Lewis, the defendant's wife, testified she and her husband went to the Sheriff's Department on November 25, 1996. Her husband was to take a polygraph test. Mrs. Lewis saw her husband a total of three times, the last when he snuck out. Her husband advised her that he felt he could not leave, and that he was going to be arrested. Her husband did not request an attorney.

Michael Smith, Special Agent for the Tennessee Bureau of Investigation and a licensed polygraph examiner, testified he met the defendant on November 25, 1996. This polygraph examination was at the request of the Lincoln County Sheriff's Department.

Agent Smith explained to the defendant how a polygraph test is conducted.[3] The defendant was advised of his *Miranda* rights through consent form. The defendant signed the waiver form, did not request an attorney, and agreed to talk and take the test. Also, the defendant was advised he was free to leave at any time and signed a form acknowledging this right. The defendant declined to have the interview and test tape-recorded. During the pretest interview, Agent Smith and the defendant discussed the meaning and definition of a vagina. As to the relevant issues, Agent Smith testified the defendant, in the test, denied touching the victim's vagina, fondling the victim's vagina, or inserting his finger in her vagina. The defendant was given two fifteen-minute breaks, and during the last break, Agent Smith evaluated the test results.

Agent Smith testified he and Detective Borenger went over the test results with the defendant. When Agent Smith informed the defendant he had failed, the defendant appeared surprised in one way and not in another way. Agent Smith did not recall specifically striking the desk with his fist, but might have used the term, "Don't insult my intelligence." Agent Smith denied threatening or making any promises to the defendant for this interview or test. Agent Smith agreed the post-test interview lasted from 3:45 p.m. to 5:57 p.m., during which the defendant was permitted to take breaks. Agent Smith agreed he shook hands twice with the defendant, at the inception of the polygraph test and again when the defendant stated he touched the victim's hair.

Detective Borenger testified he first talked to the defendant about an interview on November 8, 1996, but the defendant failed to appear due to the defendant's drinking. On November 12, 1996, Detective Borenger and Agent Pence interviewed the defendant, after

---

[3]The defendant had a previous experience with polygraphs in that he had taken one for employment.

14

an advice of rights and the defendant signing a form. The defendant had no memory of the accusation of the victim. The defendant agreed to take a polygraph test. The defendant was given a polygraph test on November 25, 1996 by Agent Michael Smith. Detective Borenger was not present during the test.

Detective Borenger testified he saw the defendant, during a break, outside the department smoking a cigarette and talking to his wife. Detective Borenger saw the defendant at 3:45 p.m. after the test. During this post-test interview with Agent Smith, Detective Borenger testified the defendant asked to see his wife. Detective Borenger responded, "We are getting down to the truth and his wife didn't have the answer." The detective testified he did not refuse the defendant the right to see his wife. Detective Borenger denied Agent Smith struck the desk with his fist.

At approximately 5:30 p.m., the defendant requested to see Detective Borenger privately. The defendant and Detective Borenger went to a restroom/locker room where the defendant said, "I'm 40 something years old. I don't know what a vagina is." After an explanation by Detective Borenger, the defendant said, "You mean a p----." Detective Borenger reread the defendant his *Miranda* rights and obtained a statement from the defendant. The defendant told Detective Borenger he went into the bedroom and noticed the girls did not have blankets on. The defendant felt V.B.'s hair, down her breast, down her stomach, and down to her area "where the hair grows." The defendant denied entering the victim's panties, but only felt of her from the outside and felt her vaginal area. The defendant signed the statement and initialed his answer to a question. Detective Borenger testified he was seeking the truth from the defendant and not a confession. Detective Borenger testified that he did go out to the defendant's car and have the defendant sign the admonition waiver, since the detective had forgotten to have the defendant do so earlier.

The trial court set out a findings of fact in which it found there was probable cause to interview the defendant. The defendant was advised of his constitutional rights under

15

the Fifth Amendment; the defendant voluntarily appeared for a polygraph test in a non-secured facility; the defendant was advised he was not under arrest and fully advised of his rights to remain silent and the presence of an attorney; the fact the interview was over five hours was not in and of itself coercive; and the fact the defendant was able to sneak out and consult with his wife. The trial court failed to find any facts to support the defendant's petition that law enforcement officers used any coercion against the defendant so as to overbear his will. The court found the defendant's statement was freely and voluntarily given.

## (2)

When an accused moves to suppress his statement given to law enforcement officers, the findings of fact made by the trial court, at the hearing on the motion, are binding upon this Court unless the evidence contained in the record preponderates against these findings. *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996); *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn. 1994). The trial court, as the trier of fact, is in the best position to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom,* 928 S.W.2d at 23. However, this Court is not bound by the trial court's conclusions of law. The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State,* 529 S.W.2d 501, 506 (Tenn. Crim. App.), <u>cert</u>. <u>denied</u> (Tenn. 1975).

## (3)

The determination of whether a confession has been obtained improperly, by coercive or improper inducement, can only be made by examining all of the surrounding circumstances involving the interrogation leading to the confession or statement. *State v. Monts,* 400 S.W.2d 722 (Tenn. 1966). The defendant does not dispute that his *Miranda* rights were read to him and he executed a form acknowledging the same. The defendant does complain the "extensive questioning had already been conducted had the ultimate

16

effect of overbearing the defendant's will to resist." *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *State v. Kelly,* 603 S.W.2d 726, 727 (Tenn. 1980). In addition, the defendant argues that his request to see his wife amounted to an invoking of his right to remain silent. However, the defendant cites no authorities for such claim.

In determining whether the defendant's confession was voluntary, this Court must consider whether the surrounding circumstances indicate that the officer's conduct undermined the defendant's free will and critically impaired his capacity for self-determination. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Also, coercive police activity is a necessary predicate to finding that a confession is not "voluntary." *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

In summation, we find the evidence does not preponderate against the trial court's findings. The defendant was 47 years old at the time of trial, had several prior arrests for misdemeanors, and had undergone a previous polygraph examination. The record is clear the defendant was never in custody during any of the interviews. The record is substantial that he was advised of his rights on at least three occasions. Although the defendant testified he was refused the right to see his wife, during the post-interview, the defendant "snuck" out and talked to his wife. The law enforcement officers denied they threatened or intimidated the defendant. We find no reason to disagree with the findings of the trial court with respect to the voluntariness of the defendant's statement.

**C.**

**VIOLATION OF RULE 608**

**TENNESSEE RULES OF EVIDENCE**


The defendant contends the State attempted to improperly cross-examine the defendant as to prior bad acts, thus depriving the defendant of a fair trial due to the highly inflammatory nature of the misconduct.


During the State's cross-examination of the defendant, the following exchange took place:

Q. You've told this jury something I didn't bring up. You've told them that V's stepmama had to call you once before about biting her. Did she? Did she call you and fuss at you?

A. Did she do what?

Q. Call you and fuss at you about biting V on the chest?

A. (No audible response.)

Q. Did she do that?

A. She told me what V said.

Q. Yeah. She wasn't happy about it either, was she?

A. No, she wasn't.

Q. And this was about a year before this happened that we're here on today, wasn't it?

A. I don't know.

Q. You talked your way out of that one, didn't you?

A. No, I didn't. I didn't even get a chance to explain.

Q. She told you V couldn't come over there anymore unless your wife was present in the house, didn't she?

A. (No audible response.)

Q. What?

A. Something along that line. I can't remember exactly.

Q. Something along that line. That's not the only little girl that can't come over to your house, is it?

18

Mr. Self: Your Honor, I object to the relevance of this question.

The Court: Approach the bench.

(At the bench)

The Court: Where are we going with that last question?

Mr. Barnard: The -- his sister will not allow her daughters to come over to the house. And he was questioned about that by the TBI. And he gave an explanation. He said it was because they saw him walking around the house naked.

The Court: I will sustain the objection. Although relevant, the prejudicial effect outweighs the probative value and would lead to confusion of the issues in front of the jury.

Mr. Barnard: Yes, sir I understand.

(Open court.)

The Court: Sustain the Defendant's objection. The jury will disregard the last question.

The defendant argues that he was entitled to an out of jury hearing pursuant to Rule 608(b)(3) of the Tennessee Rules of Evidence to determine the admissibility of such evidence so the defendant could make an intelligent decision to testify in his own behalf.

Although we agree the State's question was improper, the trial court promptly sustained the defendant's objection and instructed the jury to disregard the question. It is well settled in this State that a prompt instruction by the trial court, in most cases, cures any error. *State v. Blackmon,* 701 S.W.2d 228, 233 (Tenn. Crim. App.), per. app. denied (Tenn. 1985); *State v. Smith,* 893 S.W.2d 908, 914 (Tenn. 1994); *State v. Melvin,* 913 S.W.2d 195, 201 (Tenn. Crim. App.), per. app. denied (Tenn. 1995). The defendant has failed to establish that the jury did not follow the instruction. There is no merit to this issue.

# D.

## SENTENCING CONSIDERATIONS

The defendant insists the trial court erred by enhancing his sentence for abusing a position of private trust and not applying the mitigating factor that the defendant's conduct did not cause nor threaten serious bodily injury. At the sentencing hearing on May 6, 1997, the State urged the trial court to impose a sentence of twelve years, Range I, standard offender, based on five enhancement factors. Tenn. Code Ann. § 40-35-114(1), (4), (5), (7) and (15). The defendant urged the trial court to consider as a mitigating factor the fact the defendant did not cause nor threaten serious bodily injury to the victim. Tenn. Code Ann. § 40-35-113(1). Thus, the defendant requested the minimum sentence of eight years.

When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). Therefore, the burden of showing that the sentence is improper is upon the appealing party. *Id.* The presumption that determinations made by the trial court are correct is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant factors and circumstances. *State v. Ashby,* 823 S.W.2d 166 (Tenn. 1991); *State v. Smith,* 898 S.W.2d 742 (Tenn. Crim. App. 1994), per. app. denied (Tenn. 1995).

If appellate review reflects that the trial court properly considered all relevant facts and its findings of fact are adequately supported by the record, this Court must affirm the sentences "even if we would have arrived at a different result." *State v. Fletcher,* 805 S.W.2d 785 (Tenn. Crim. App. 1991). In arriving at the proper determination of an appropriate sentence, the trial court must consider: (1) the evidence at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code

Ann. § 40-35-210(a) and (b) (1997); Tenn. Code Ann. § 40-35-103(5); *State v. Holland,* 860 S.W.2d 53 (Tenn. Crim. App. 1993).

In this case, the defendant was convicted of aggravated sexual battery, Tenn. Code Ann. § 39-13-504, and, therefore, was not eligible for any consideration of an alternative sentence. Tenn. Code Ann. § 40-35-303. Since the trial court considered the sentencing principles applicable to this offense, we conduct our review with the presumption that the trial court was correct.

In determining the appropriate sentence, the trial court referred to the guidelines as required by the Tennessee Sentencing Act. The trial court found two enhancement factors: (1) the defendant had a history of criminal convictions, four or five DUI convictions based on the defendant's admission in the presentence report, and (2) the defendant abused a position of private trust. In rejecting the defendant's request to apply the lack of serious bodily injury as a mitigating factor, the trial court found the testimony of Mrs. Sherry Armstrong, the victim's mother, compelling. Mrs. Armstrong testified her daughter continues to suffer trauma and that the victim has sought counseling through her school for this offense. The trial court stated:

> Serious bodily injury does not necessarily mean a cut, abrasions or other physical trauma to the body but may also be a mental trauma and if there is a protracted loss of a member of a mental faculty in the form of trauma there in this court's mind given the nature of the offense as well as the facts of this particular case there was a threat of what the law defines as serious bodily injury.

In assessing the enhancement factors proven by the State, the trial court gave little weight to the defendant's history of past convictions, due to their age. The defendant contends the enhancement factor of the abuse of a private trust is not applicable to him, in that due to a prior agreement between the victim's stepmother, the defendant's wife was always present when the victim was in the defendant's home. The trial court rejected this argument by stating:

> Now, the Court can and in this case does take into consideration the circumstances of the offense in determining the method manner and degree that the private trust was abused. In that particular situation

21

or this situation argument the State does have some merit that this child in effect felt trapped in the situation that not only did the defendant abuse his position by going into the room by committing the offense for which he would have not been able to do but was for a period of time able to cover up the offense by not allowing the child to communicate with or parents or others and I think the Court can place a much more significant and greater weight upon 40-35-114 (15) than it might in some other cases.

In conclusion, we find the evidence in this record fully supports the trial court's imposition of a ten-year sentence. The judgment of the trial court is affirmed.

_____
L. T. LAFFERTY, SPECIAL JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
THOMAS T. WOODALL, JUDGE

22